#29415-dismiss-JMK
**2022 S.D. 2**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

FIRST NATIONAL BANK,                                   Plaintiff and Appellee,

    v.

SHARMIN R. INGHRAM, JUSTIN
GLEN INGHRAM a.k.a. JUSTIN G.
INGHRAM,                                                       Defendants and Appellants.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
MEADE COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE ERIC J. STRAWN
Judge

\* \* \* \*

JAMES P. HURLEY
Rapid City, South Dakota                              Attorney for defendants and
appellants.


JEFFERY D. COLLINS
DANA VAN BEEK PALMER of
Lynn, Jackson, Shultz & Lebrun, P.C.
Rapid City, South Dakota                              Attorneys for plaintiff and
appellee.

\* \* \* \*

CONSIDERED ON BRIEFS
MAY 25, 2021
OPINION FILED **01/12/22**

#29415

KERN, Justice

[¶1.]     First National Bank (FNB) is a South Dakota chartered financial lending institution.  Justin and Sharmin Inghram (Inghrams) are a married couple who entered into five loans with FNB in order to start a new business in Faith, South Dakota.  Beset by significant construction delays and staffing issues, the Inghrams struggled to repay their loans from FNB.  After several years of poor or no repayment history, FNB filed an action seeking foreclosure of their real estate and replevin of their business property which collateralized the loan.  The Inghrams filed counterclaims against FNB for breach of fiduciary duty, breach of contract, and fraud and deceit.  The circuit court granted FNB's motion for summary judgment regarding its foreclosure and replevin claims, denied FNB's request to dismiss the Inghrams' counterclaim for fraud, awarded FNB attorney fees, and certified its decision as a final judgment.  The Inghrams appeal.  For the reasons explained below regarding Rule 54(b) certification, we dismiss the appeal.

## Background

[¶2.]     For summary judgment purposes, we must view the facts most favorably to the Inghrams.  These facts show that FNB has a local branch office in Newell, South Dakota.  At the Newell branch, the Inghrams sought to refinance their existing debt and obtain construction financing for a custom meat processing business in Faith, South Dakota.  The Inghrams owned both a personal residence and a commercial property in Faith.  The Inghrams planned to repurpose their commercial property, then a metal fabrication shop, into the meat processing plant.

-1-

In the process of securing funding for the meat processing business, the Inghrams applied for and received five separate loans from FNB.

[¶3.]    Sometime in March 2014, Justin Inghram began talking with FNB loan officer Bryce Richter in the Newell office about the possibility of obtaining the first two loans for the business. When presenting their business plan, the Inghrams told Richter that a custom meat processing business was needed in the area. Justin already had a building, some meat-cutting and other equipment, and the necessary employees for the new business, but needed to renovate his current facility and add a cold storage space. Justin estimated that the business could process and package up to 350 head of cattle and 100 head of hogs and sheep combined each year. After looking at the Inghrams' collateral listed on his balance sheet, existing debt, and the projected cash flows, Richter told Justin that FNB would be interested in lending construction and operating funds to allow him to develop the business.

[¶4.]    In describing the proposed renovation plans for the facility, Justin explained that the first step would be to secure an electrician capable of rewiring the building so that the other subcontractors could then complete the heating, plumbing, and refrigeration work. Justin had already obtained proposed cost estimates from two electricians. Richter told Justin that FNB had recently used a local electrician, Jack Johnson, and his company Heartland Electric, for a project on FNB's building. Based on Richter's recommendation, Justin spoke with Johnson in June 2014 and Johnson provided a bid and a construction timeline for work on the renovation project. Richter did not inform the Inghrams that Johnson was also an FNB customer.

[¶5.] Johnson quickly provided Justin with a lower bid than the other electricians. Johnson also promised that he would take only three-and-a-half weeks to complete the work and that he could start in July—which was about a month earlier than the two other electricians could start. On June 6, 2014, the Inghrams allege, and FNB and Richter deny, that Richter arranged for a meeting between Justin and Johnson at FNB so that they could reach an agreement. Justin stated that he met Johnson at FNB's Newell branch and accepted his bid. A few hours later, Justin stated that Richter had loan documents drafted and ready for Justin's review and signature. In his deposition, Richter flatly denied ever conditioning the Inghrams' loan approval on using Johnson as the electrical contractor.

[¶6.] The first of two loans executed that day, #803705, had a principal amount of $147,999.50 and was secured by a mortgage on the Inghrams' commercial real estate in Faith. Because the Inghrams wanted to migrate their full banking relationship to FNB, Justin entered into this loan to satisfy another loan that he had with a different lending institution. FNB also took a security interest in Justin's business collateral and assignment of rents for loan #803705 pursuant to a commercial security agreement. The terms required monthly payments of $962.35 per month for a period of 25 years with the first payment due the month following execution of the loan. The second loan, #803706, was a new business loan for $100,575 and was secured by the same business collateral as loan #803705. The terms of the second business loan required monthly payments of $1,295.89 for 59 months with the first payment due three months from the date of signing.

[¶7.]     Soon after executing the loans, Justin experienced construction delays. Justin claims that most of the delays stemmed from his decision to hire Johnson because he took 17 months to complete the electrical work rather than the three-and-a-half weeks originally promised, which caused other construction work to stall. During this period of delay, Justin and FNB entered into a third business loan, #803795, on September 29, 2014, for $28,350. The terms of the loan required 47 monthly payments of $681.02, starting in November. The loan was secured by the existing business collateral and a 1999 International Truck.

[¶8.]     During the fall of 2014 and spring of 2015, construction proceeded at a slow pace, prompting Justin to look for a different electrical contractor. However, he was unable to find another electrician because they were all too busy to take on the job. Justin claimed he was "stuck" with Johnson.

[¶9.]     On May 22, 2015, Sharmin Inghram and FNB executed two additional loans to cover business expenses. The first loan, #803986, was for $52,463.50 with monthly payments of $343.63 through July 2040. As security for the loan, Sharmin granted FNB an interest in the business collateral and provided a mortgage and assignment of rents on the personal residence the Inghrams owned in Faith. Sharmin also executed a second loan that day, #803991, to secure an operating line of credit with a principal amount of $41,350. This loan was for a one-year term requiring one payment in full upon maturity. The second loan was secured by business collateral and by an additional commercial security interest granted by Sharmin to FNB in several of the Inghrams' titled vehicles and trailers.

[¶10.] By December 2015, construction of the processing facility was finally complete, and the Inghrams were open for business. However, the Inghrams had not made regular payments on any of the loans during the construction process. Accordingly, all five of the Inghrams' loans with FNB were in default. During this time, FNB had been discussing repayment options with the Inghrams, and at some point, the Inghrams allege, FNB orally agreed to extend Justin's payments, "effectively putting them on the back end of his loans."

[¶11.] Eventually, Richter required Justin to seek funding from other lending institutions before further restructuring the debts. Although nothing in the record shows a formal agreement between FNB and the Inghrams to restructure the debts, Justin claimed that FNB promised from the beginning of the lending relationship that it would consolidate the short-term construction loan and subsequent business loans into one loan with a longer amortization period. FNB's internal loan documents reveal that as of February 2016, FNB's "primary course of action will consist of a guaranteed consolidation loan." In his deposition, Richter denied that FNB ever committed to a new consolidated, long-term loan with the Inghrams, claiming that the comment notes reflect "merely a statement as to what the intention [was]."

[¶12.] Notably, Kevin Bossman, president of FNB's Newell branch, admitted that he and Richter documented, in the notes for loan #803986, the plan "to consolidate and refinance all of the existing debt, including the debt held by Sharmin's husband, Justin Inghram, and acquire a guarantee on the debt going

forward."[1]  Bossman acknowledged that the bank prepared pro-forma internal loan documents and ordered an appraisal of the real estate in preparation for consolidation of the Inghrams' outstanding loans, amortizing them over a 25-year term.  However, the loan consolidation was never approved or sent to the loan committee for consideration.  Furthermore, he testified that Richter "did not have authority to refinance without loan committee approval."

[¶13.]    Nevertheless, at FNB's suggestion, Justin sought new credit from other banks and investors and guarantees from other entities.  Justin claimed that the original balance sheet and cash flow statements, which he gave to FNB when he applied for his loans, were sent by FNB, at Justin's request, to the other financial institutions in an "altered" state, in that FNB placed its own handwritten valuations on the Inghrams' assets on the balance sheet.  In Justin's view, because of the valuations added by FNB, some of his credit applications were denied.

[¶14.]    Richter acknowledged in his deposition that he made alterations to the Inghrams' balance sheet over time to "update the[ir] current financial position" and to indicate "a side note as far as determination, indication, or thought of collateral value."  Richter claimed that his mark-up of the Inghrams' balance sheet was "not a revaluation of the collateral" but rather a standard practice that the bank

---

1.    Under FNB's action plan, dated February 2016, the loan officers set forth the options the bank would pursue: "The bank will look to consolidate all debts acquired in order to complete the institution of the business and refinance these debts under a governmental guaranty."  Although the loans were past due as of February 2016, this fact was not listed as a hinderance to the consolidation and refinancing plan.  The bank obtained updated appraisals on the Inghrams' real estate as part of the requirements for a refinance in March 2016.

undertook with its borrowers. Regardless, Richter claimed that any other loan officer or investor would have completed their own balance sheet with the Inghrams rather than relying solely on financial statements the Inghrams completed with FNB.

[¶15.]     Justin did have some success in securing funding from two private investors and through programs offered by the United States Department of Agriculture (USDA) and the Small Business Association (SBA), whereby FNB's loan would be guaranteed for up to 80 percent of the loan amount (for the USDA program) or 50 percent of the loan amount (for the SBA program). Justin claimed that he presented his approval for the government programs to FNB, but FNB refused to consolidate and restructure his loans. Richter clarified in his deposition that because the Inghrams were not current with any of their loan payments, FNB would be unable to use the loan guarantees that the USDA or SBA provided.[2] FNB's internal loan documents, created by the new loan officer assigned to the Inghrams' loans, reflected that the bank wanted to conclude its relationship with the Inghrams and was "still hoping to have [the loans] paid off by the end of February [2017]."[3] This payoff would have been accomplished by the Inghrams obtaining financing from other entities.

[¶16.]     Although the Inghrams' meat-cutting business was operating, it could not generate its projected cash-flow, and at some point in early 2017, FNB decided

---

2.     By January 2018, FNB loan officers noted in their action plan that the USDA or SBA guarantees were rejected because "[n]o guarantees are available while loan is past due."

3.     Richter left FNB's employment sometime in 2016.

to foreclose on the loans. FNB claimed that the Inghrams failed to make any payments on any of the loans. Conversely, Justin claims that he made multiple payments on the loans, but neither party has provided the transaction history detailing the payments, and both rely solely upon affidavits and deposition testimony. When questioned about the Inghrams' payment history, Bossman acknowledged in his deposition that the Inghrams made some loan payments to FNB in 2014 and 2015.[4]

[¶17.]    By June 7, 2017, FNB's legal counsel had mailed the Inghrams notification of their right to cure their default on each of the five delinquent loans, but the Inghrams were unable to bring any of the loans current. In November 2017, FNB filed a three-count complaint seeking to foreclose on the mortgages and to liquidate the business collateral and titled vehicles. According to the complaint, by September 2017, the Inghrams owed a total of $447,866.48 for principal, accrued interest, late charges, penalties, and other fees.[5]

[¶18.]    The Inghrams answered, claiming that FNB was precluded from foreclosing because the bank intentionally caused them to default by sending altered balance sheets and cash flow statements to other potential funding sources,

---

4.    In its brief in support of summary judgment, FNB claims the Inghrams never made a payment on the loans. The circuit court adopted FNB's statement of undisputed material facts in its memorandum decision, holding that the Inghrams never made any payments on their loans from FNB. However, the circuit court further acknowledged that the record may show that the Inghrams made sporadic payments on their loans. To that extent, the circuit court's memorandum opinion is internally inconsistent.

5.    The Inghrams' loans were well-collateralized as shown in the balance sheets provided to FNB. The Inghrams had total assets as of 2014 valuing $841,800.

encouraging them to hire Johnson, and by breaching an agreement to restructure the loans. The Inghrams filed counterclaims against FNB for breach of fiduciary duty, breach of contract, and fraud and deceit based upon these assertions.

[¶19.] In April 2018, FNB moved for summary judgment, providing a statement of undisputed material facts and a brief in support thereof. In response, the Inghrams claimed there were genuine issues of material fact regarding their counterclaims and whether FNB caused their default. The Inghrams filed Justin's affidavit and a non-movants' statement of material facts and a response to movant's statement to support their response. At the same time, the Inghrams also filed for a continuance to permit additional discovery. Specifically, the Inghrams sought to depose Richter and Bossman and to request production of the transaction history for each of their loans. FNB did not object to the continuance, and the court granted the Inghrams' motion.

[¶20.] Bossman's deposition was taken on November 27, 2018, and the Inghrams took the deposition of Richter on May 7, 2019.[6] As a result of additional discovery from the depositions, on July 15, 2019, the Inghrams filed a supplemental statement of material facts to include information regarding FNB's promises to refinance the Inghrams' loans. The Inghrams also claimed a genuine dispute of material fact existed regarding whether any payments were made on the loans with FNB because the Inghrams "have a copy of bank documents that show payments

---

6. Justin's deposition was taken on November 26, 2018, but was not included in the record other than the portion filed by FNB in its renewed motion for summary judgment. The record also does not contain the loan transaction records.

were in fact made on these loans." However, the Inghrams failed to attach bank documents or any portion of the depositions to the pleading.

[¶21.] FNB renewed its motion for summary judgment on July 23, 2019, asserting that no genuine dispute of material fact existed as to FNB's foreclosure claim. FNB also filed a motion to dismiss the Inghrams' counterclaims. FNB included a few pages of Justin's, Bossman's, and Richter's depositions as a separate attachment to its renewed motion for summary judgment. They claimed that the depositions and bank records showed that the payments the Inghrams made on their loans were merely advances from other loans and that the Inghrams "never put their own money into their accounts to actually pay down any of the notes."

[¶22.] The circuit court held a hearing on August 28, 2019, regarding the summary judgment motion.[7] After the hearing, the court notified the parties that it intended to treat the motion to dismiss the counterclaims as a motion for summary judgment and required the parties to provide all additional filings regarding such by December 20, 2019. Accordingly, the Inghrams filed additional statements of material facts which purported to show that genuine issues existed regarding the counterclaims. Counsel for the Inghrams also filed two affidavits: one containing the relevant loan documentation (but still not providing any documents relating to loan payments relevant to the foreclosure and replevin claims) and another attaching the full depositions of Richter and Bossman.

[¶23.] The circuit court issued its memorandum decision in January 2020. The court held that the Inghrams failed to properly resist FNB's summary

---

7. The record does not contain the transcripts of any of the hearings.

judgment motion on its foreclosure and replevin claims because the Inghrams failed to produce evidence purporting to show that they made regular, required payments on the loans. While acknowledging the Inghrams' claim that several bank documents may prove that they made some payments on the loans, the court held that because the documents were not included in the record, the Inghrams' claim failed. In any event, the court held that sporadic repayments did not defeat FNB's foreclosure and replevin claims because "[t]he record is clear that they failed to comply with the terms of their [loan] contract[s] which required them to pay every month." Finally, the circuit court denied summary judgment on one of the Inghrams' counterclaims, presumably for fraud, holding that Justin's affidavit presented genuine issues of material fact.[8] The court directed FNB to prepare a proposed order and judgment.

---

8.    There is some ambiguity in the court's holding on the counterclaims because the circuit court held that "the claim [for fraud] survives as there are genuine issues of material fact regarding that issue *alone*." (Emphasis added.) The court's memorandum decision does not specifically address the other two counterclaims for breach of fiduciary duty and breach of contract but it is clear that the single fraud claim survived. The court's final order denying FNB's motion to dismiss does not mention which counterclaim survived but uses "counterclaim" rather than "counterclaims" when addressing the remaining issues in the case. Therefore, it appears from the memorandum decision and order that only one counterclaim—the fraud claim—remained.

    In the parties' briefing before this Court, FNB speaks of the Inghrams' remaining counterclaims in the plural sense, while the Inghrams speak of their remaining claim as a single claim. Based on the Inghrams' and FNB's briefings and the underlying memorandum decision and order, we presume that there is only one surviving counterclaim and it is for fraud.

[¶24.] On May 15, 2020, FNB submitted its proposed order and judgment as well as an affidavit for attorney fees.[9] FNB's proposed order sought certification of the court's summary judgment decision as a final judgment per SDCL 15-6-54(b). The proposed order also awarded FNB its requested attorney fees. FNB's affidavit for attorney fees sought fees of $48,012 and gave the hourly rate for the work performed. However, the affidavit did not provide the number of hours worked or an itemization of the tasks performed, citing confidentiality concerns in light of the pending counterclaim. FNB offered to provide the court a redacted billing statement or an in-camera review of the documents, but the record is silent as to whether the court required more information.

[¶25.] The Inghrams filed an objection to the proposed final order, claiming that the circuit court did not make the requisite findings in its decision to warrant a Rule 54(b) certification. The Inghrams also argued that the counterclaim for fraud precluded certification of the foreclosure and replevin action as a final judgment. FNB responded to the objection as to why it included the certification language in the proposed order. In FNB's view, because the Inghrams had made no payments on the loans since 2014, the bank should be allowed to recoup its losses.

[¶26.] The Inghrams also objected to FNB's proposed order for attorney fees, arguing that the amount requested was unreasonable because the affidavit did not include an itemized statement of the hours worked and the circuit court did not conduct an analysis of the factors justifying fees. Thus, the Inghrams argued that

---

9. On June 4, 2020, FNB requested the court to stay pending orders so the parties could conduct settlement discussions. On August 3, 2020, FNB notified the court that the parties' settlement negotiations were unsuccessful.

the circuit court lacked sufficient information to determine what constituted a reasonable award of attorney fees.

[¶27.] The court issued its final order and judgment on August 8, 2020. The court awarded the full amount of attorney fees sought by FNB and certified its order as a final judgment. The court held that "[f]ull adjudication of the claims, including appeal of the same, is necessary even though [the Inghrams'] counterclaim remains. Those additional claims[10] are affected by final resolution of the foreclosure and replevin claims, and it would create a hardship on the parties if appeal of the foreclosure and replevin actions were to await resolution of all claims."

[¶28.] The Inghrams appeal, raising multiple issues in support of their argument that the circuit court erred in granting FNB's motion for summary judgment. However, because we dismiss this appeal based on issues with the circuit court's order for Rule 54(b) certification, we consider only whether the circuit court abused its discretion in certifying its order as a final judgment under SDCL 15-6-54(b).

**Analysis and Decision**

[¶29.] The Inghrams claim that the circuit court abused its discretion in certifying the foreclosure and replevin claims as a final judgment because the circuit court failed to "marshal and articulate the factors" for certification and did not "balance the competing factors." Citing the order's lack of specificity, the Inghrams claim that the court engaged in "mere recitation of the statutory language

---

10. The language of the court's order referencing "Those additional claims . . . " presumably refers to the Inghrams' sole remaining counterclaim for fraud. Thus, the court's use of plural language is most likely in error.

which is legally insufficient." Because the counterclaim alleging fraud regarding the loan is still pending, the Inghrams argue that this is not a set of unusual circumstances that justify piecemeal review. We agree.

[¶30.] "[O]ur appellate jurisdiction is generally limited to a review of final judgments." *Huls v. Meyer*, 2020 S.D. 24, ¶ 14, 943 N.W.2d 340, 344 (citation omitted). A review of a circuit court's certification of a final judgment under SDCL 15-6-54(b)[11] adjudicating some, but not all, pending claims is therefore a threshold question affecting this Court's jurisdiction. *See Stromberger Farms, Inc. v. Johnson*, 2020 S.D. 22, ¶ 21, 942 N.W.2d 249, 256. We review a court's decision certifying an order as a final judgment for an abuse of discretion. *Jacquot v. Rozum*, 2010 S.D. 84, ¶ 14, 790 N.W.2d 498, 503.

[¶31.] While a "court may enter a final judgment on a single issue in a multi-claim case under SDCL 15-6-54(b)," we have repeatedly held that courts should not routinely enter such judgments and that they are only appropriate when justified by special circumstances. *Stromberger Farms, Inc.*, 2020 S.D. 22, ¶ 22, 942 N.W.2d at

---

11. SDCL 15-6-54(b) provides:

> When multiple claims for relief or multiple parties are involved in an action, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

256. "Rule 54(b) certification is not a procedural formality." *Weisser v. Jackson Twp. of Charles Mix Cnty.*, 2009 S.D. 43, ¶ 4, 767 N.W.2d 888, 889. The purpose of Rule 54(b) certification is to "improve[ ] [the] administration of justice," not to provide "a courtesy or accommodation to counsel." *Davis v. Farmland Mut. Ins. Co.*, 2003 S.D. 111, ¶ 13, 669 N.W.2d 713, 718 (citation omitted). To further this purpose, we have identified three principles to guide a court in a Rule 54(b) analysis:

> (1) the burden is on the party seeking final certification to convince the trial court that the case is the "infrequent harsh case" meriting a favorable exercise of discretion; (2) the trial court must balance the competing factors present in the case to determine if it is in the best interest of sound judicial administration and public policy to certify the judgment as final; (3) the trial court must marshal and articulate the factors upon which it relied in granting certification so that prompt and effective review can be facilitated.

*Nelson v. Est. of Campbell*, 2021 S.D. 47, ¶ 27, 963 N.W.2d 560, 568 (quoting *Davis*, 2003 S.D. 111, ¶ 13, 669 N.W.2d at 718–19). *Nelson* also notes several factors that may bear upon a court's decision to allow Rule 54(b) certification, including:

> (1) the relationship between the adjudicated and unadjudicated claims; (2) the possibility that the need for review might or might not be mooted by future developments in the [trial] court; (3) the possibility that the reviewing court might be obliged to consider the same issue a second time; (4) the presence or absence of a claim or counterclaim which could result in setoff against the judgment sought to be made final; (5) miscellaneous factors such as delay, economic and solvency considerations, shortening the time of trial, frivolity of competing claims, expense, and the like.

*Id.* ¶ 28, 963 N.W.2d at 568–69 (citation omitted).

[¶32.] Regarding the first principle guiding a Rule 54(b) analysis, requiring a showing of hardship, because FNB requested the certification, FNB bore the burden

of showing that the circumstances of the case required Rule 54(b) certification. The circuit court did not directly address this first factor as it relates to the hardship on FNB, but we are not persuaded that FNB has met its burden given the status of the remaining claim. The circuit court determined that questions of fact exist on the Inghrams' counterclaim for fraud. The Inghrams' fraud claim includes allegations that FNB made false statements that induced them to enter into the loan agreements with FNB. Although the circuit court found there were no genuine issues of material fact concerning the default by the Inghrams or the loan balance, it is not clear from the record that the circuit court granted summary judgment on the claim for fraud in the inducement. Proof of fraud in the inducement may invalidate a contract. A party alleging fraud in the inducement "may affirm the contract and bring a tort action for deceit [seeking monetary damages], or he may repudiate the contract and bring a contract action for rescission or revision." *Stabler v. First State Bank of Roscoe*, 2015 S.D. 44, ¶ 13, 865 N.W.2d 466, 475 (cleaned up).

[¶33.] Here, the Inghrams have alleged a claim for damages arising from their fraud claims, rather than a claim for rescission. However, the Inghrams' counterclaims for fraud in the inducement are inextricably tied into the contract claims by FNB, and at a minimum, may provide a basis for setoff against the loan balances. Therefore, FNB has not demonstrated the necessary showing under the first factor that it will face a hardship if the claims are not certified under Rule 54(b).

[¶34.]	As for the second and third principles, that the circuit court must balance competing factors present in the case and marshal and articulate those factors for our review, we are unable to evaluate the circuit court's analysis of such factors because they are not set forth by the court. Providing a "reasoned statement in support of [a circuit court's] determination that there is no just reason for delay" is central to a circuit court's Rule 54(b) analysis. *Nelson*, 2021 S.D. 47, ¶ 29, 963 N.W.2d at 569 (cleaned up). Here, the circuit court's certification order holds in conclusory fashion that "it would create a hardship on the parties if appeal of the foreclosure and replevin actions were to await resolution of all claims." Although it appears that the court considered the relationship between the adjudicated claims and unadjudicated claims because the evidence for all the claims was intertwined, the circuit court did not address the possibility that it might need to consider the same issues a second time. For example, the circuit court did not consider whether the Inghrams' counterclaim, if successful, would entitle them to a setoff to the foreclosure judgment. Also missing from the court's order is consideration of delay, expense, economic, and solvency factors. Therefore, we cannot evaluate the balancing process utilized by the circuit court in formulating its order.

[¶35.]	We have allowed a "narrow exception" to the requirement of a reasoned statement for a Rule 54(b) certification "in instances where the justification supporting a Rule 54(b) certification is readily apparent from the record." *Nelson*, 2021 S.D. 47, ¶ 30, 963 N.W.2d at 569 (cleaned up). Here, based on our review of the scant record on this point, it is apparent only that the record cannot support the Rule 54(b) certification. While FNB did argue in its pleadings

that certification was necessary because the Inghrams made no payments on their loans since 2014, and FNB was therefore entitled to recoup its losses, the court made no finding on this point.[12] And while interest rates and attorney fees are accruing in the case, this has been true since the inception of the loans in 2014, which may ultimately inure to the benefit of FNB as a well-collateralized, secured party. Based on this record, we "discern no special circumstances indicating a danger of hardship or injustice through delay that would be alleviated by an intermediate appeal . . . ." *Weisser*, 2009 S.D. 43, ¶ 6, 767 N.W.2d at 890.

[¶36.] Nevertheless, FNB argues that "[t]he circuit court here clearly explained the basis for its certification" and properly exercised its discretion. For support, FNB likens this case to *Stromberger Farms, Inc.*, where we upheld the circuit court's decision to grant Rule 54(b) certification because the "justification for the circuit court's entry of final judgment [was] readily apparent." 2020 S.D. 22, ¶ 24, 942 N.W.2d at 257. In *Stromberger Farms, Inc.*, the circuit court granted a Rule 54(b) certification regarding a summary judgment ruling that resolved *all* claims and counterclaims involving the disposition of proceeds from the sale of cattle. *Id.* ¶ 25, 942 N.W.2d at 257. And although the circuit court did not make specific findings on any of the factors, this point of error was immaterial because the

---

12. In its memorandum decision, the circuit court pointed out FNB's role in delaying resolution of this case. The circuit court filed an email chain wherein FNB's counsel's staff unexpectedly, and without reason, cancelled a June 11, 2018 summary judgment hearing. The court noted that after FNB's counsel's unexplained cancellation, there was no movement in the case for ten months.

remaining tort claims were unrelated to the agreement for the sale of the cattle.  *Id.* ¶ 26, 942 N.W.2d at 257.

[¶37.]    Unlike the situation in *Stromberger Farms, Inc.*, the facts surrounding the remaining fraud claim in this case are closely interwoven with FNB's foreclosure and replevin judgment.  Indeed, the circuit court's order, holding that the final resolution of the foreclosure and replevin claims affect the Inghrams' fraud claim, acknowledges this fact.  We have repeatedly held that a court "must include a reasoned statement in support of its determination . . . where the justification for the certificate is not apparent."  *Jacquot*, 2010 S.D. 84, ¶ 14, 790 N.W.2d at 503 (citation omitted).  This mandatory requirement is missing from the record before us.

[¶38.]    Because the certification order fails to satisfy the Rule 54(b) principles discussed above, and after consideration of both the order and the record, we determine that accepting appellate jurisdiction here would lead to piecemeal litigation of FNB's and the Inghrams' claims.  Therefore, we dismiss this appeal.

[¶39.]    JENSEN, Chief Justice, and SALTER, DEVANEY, and MYREN, Justices, concur.